AMERICAN BARGE LINE CO. *v.* JONES & LAUGHLIN STEEL
CORPORATION.

(*Jackson,* April Term, 1942.)

Opinion filed June 27, 1942.

158

SHEPHERD, OWEN & HEISKELL, W. V. BEAL, and C. B. DUDLEY, JR., all of Memphis, for plaintiff in error.

W. P. ARMSTRONG, SR., W. P. ARMSTRONG, JR., and BENJAMIN GOODMAN, all of Memphis, for defendant in error.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

The Steel Corporation recovered a judgment for $2,900 against the Barge Company for damages to a runway extending out into the river at Memphis, resulting when several loose barges floating down the river struck the runway. The accident occurred on the 31st of January, 1937, during the disastrous flood of that year, which caused great loss of life and property in the Mississippi Valley. The barges were not the property of the Barge Company, the theory of plaintiff being, and the proof showing that these barges had been negligently moored by the crew of the steamboat *American*, the general property of the Barge Company, at a point above the

runway and, breaking away, had been carried down on the current to the point of collision.

Among other grounds of defense interposed by the Barge Company, it was insisted that on the day of the accident, and particularly at the time of the alleged negligent mooring of the barges, the steamboat *American* was not on the business, or in the service, or under the control of the Barge Company, but had been leased to the American Red Cross, a National charitable organization, which had taken over the rescue work on the river, under contract conditions which vested in the Red Cross the entire control, management and direction of the *American* for the occasion and, specifically, that in the particular conduct charged to have been negligently performed, to-wit, the mooring of these barges, the crew of the vessel had acted under the immediate control and direction of, and for the exclusive use and benefit of, the Red Cross.

From an adverse finding and judgment of the jury and trial Court, the defendant Barge Company appealed. The judgment was affirmed by the Court of Appeals. A petition for *certiorari* was granted by this Court and argument has been heard. The determinative issue here presented is that of the nature and extent of the control of the vessel vested in the Red Cross by the contract by virtue of which the operation and management of the vessel and crew was taken over by the Red Cross; and, incidentally, whether or not prejudicial error was committed in excluding certain testimony.

Much authority has been adduced and many cases cited by learned counsel in briefs and argument. The general principles controlling are well settled. A contract of the general character here involved, for the leasing of a vessel, technically termed a charter party, may, as affecting liability for damages in operation, fall into

either one of two classes, depending on the construction to be given the charter party.

■■ In the early and leading case of *Leary* v. *United States,* 14 Wall., 607, 610, 20 L. Ed., 756, Mr. Justice FIELD thus declared the governing law:

"There is no doubt that under some forms of a charter-party the charterer becomes the owner of the vessel chartered for the voyage or service stipulated, and consequently becomes subject to the duties and responsibilities of ownership. Whether in any particular case such result follows must depend upon the terms of the charter-party considered in connection with the nature of the service rendered. The question as to the character in which the charterer is to be treated is, in all cases, one of construction. If the charter-party let the entire vessel to the charterer with a transfer to him of its command and possession and consequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated. But, on the other hand, if the charter-party let only the use of the vessel, the owner at the same time retaining its command and possession, and control over its navigation, the charterer is regarded as a mere contractor for a designated service, and the duties and responsibilities of the owner are not changed. In the first case the charter-party is a contract for the lease of the vessel; in the other it is a contract for a special service to be rendered by the owner of the vessel."

■ Here, as there, the question is one of construction of the contract. If the contract is one "for the lease of the vessel," the liability is that of the charterer, here the Red Cross; if "for a special service to be rendered by the owner of the vessel," in his use of it, the liability remains with the owner. Consider a simple illustration.

A owns a boat on the river. B operates a saw mill at Memphis. B contracts with A to take his boat to Paducah and bring down to Memphis and deliver there a raft of logs. A is liable for all acts of negligence in operation of the boat.

But, if B, desiring to have logs brought down the river, contracts with A for his boat for the month of January, contemplating making use of it in hauling logs generally on the river, when and where and as he chooses, at an agreed *per diem* or monthly rental, B is liable for damages in operation negligently inflicted, in the absence, of course, of an agreement to the contrary. And whether or not the lease includes the crew, fuel, etc., within the compensation fixed, is not determinative.

In the one case the engagement is "for a special service to be rendered by the owner of the vessel"; in the other, "for the lease of the vessel," with or without its crew, according to its terms.

In the *Leary* case the contract was in writing and called for construction of the writing. Construction and decision in the instant case is complicated by the absence of a writing. It is necessary first to determine what was the contract or terms, express or implied, under or on which the *American* was being operated on this occasion.

We find no material conflict, or contradictions, in the testimony. The dispute is not so much one of fact, for a jury, as one of construction of established facts, for the Court. The chief difficulty is in the meagerness of the facts developed, and we think this meagerness has been contributed to by the exclusion of certain testimony to which reference will be later made.

The proof as to the terms of the contract, so far as developed, is substantially as follows: Dr. Louis LeRoy was the Director of the Red Cross rescue work at Mem-

phis, under the conditions above described. He was of wide experience and unusual fitness for this important work. Working under great pressure in an effort to respond to the multiple demands for aid, he was constantly taking over river craft of all descriptions and from every available source, and sending the boats, barges, etc., here and there, wherever he decided the most urgent need to be, and with instructions in each case to perform the emergency duties arising. It may be here remarked that this general picture of his requirements in taking over boats on the river would appear to preclude the possibility that he could have foreseen or outlined any specific services to be performed by any particular boat chartered.

In this situation Dr. LeRoy telephoned the American Barge Line Company and his testimony as to the arrangement made for the Red Cross to take over the *American* is, in substance, expressed in varying language (interspersed with objections and argument of counsel and comments and rulings of the Court) that, in response to his urgent representations of need for the steamboat *American*, then in the harbor, it was turned over to him, "to collect barges in the neighborhood and up and down the river, and transport them to Memphis to be loaded and for strategic purposes . . . and what is necessary for the American Red Cross." The boat was to be supplied or "allocated" for use immediately, and then, "the usual and customary arrangement" was to be worked out "between the Barge Company and the Business Department of the Red Cross at once." Dr. LeRoy did not undertake to state exactly, or in detail, what the "usual and customary" provisions incorporated in these charter contracts were. In fact, he was not permitted to do so, over objections. Counsel for the Barge Company

excepted and were allowed to have certain testimony of Dr. LeRoy touching this matter read into the record, along with that of other witnesses offered for a like purpose. In this excluded testimony he stated that, "we took over, that is, the Red Cross took over, the boats, were in command of them, were to all intents and purposes the temporary owners of the boats, and would have been responsible for the same as though they owned the boats themselves," etc. There was more to the same effect. Copies were produced by one witness of forms of contracts commonly used in the chartering of boats, which vested control and transferred liability in the towing of barges to the charterer.

■■ It can hardly be questioned that, if this testimony as to the arrangement between the parties should be read into the verbal agreement (no written agreement was ever executed, the *American* having been turned back to the Barge Company the next day because its stacks would not pass under the bridge on the high tide), a clear case of demise would be presented. Now we are of opinion that this testimony was admissible, if for no other reason, in application of the doctrine of incorporation by reference. It has been observed that the meager statement of the verbal agreement made by Dr. LeRoy, under which the Red Cross took over the *American*, referred to the "usual and customary" plan or terms of the lease agreements for river craft made by the Red Cross, and his proposal that this "usual and customary" plan would be followed in the case of the *American*. The effect was to embody in this skeleton verbal agreement by reference these "usual and customary" terms. It is, therefore, obvious that it was competent, indeed essential, to show what these "usual and customary" terms were. The rejection of this testimony was, therefore,

prejudicial error. Admitted a case was presented which would have called for a directed verdict for the defendant.

But, looking alone to such portions of the testimony as were admitted and not controverted, we are satisfied, after a careful review, that a demise of the vessel is established, when the applicable rules of legal construction hereinafter noted are considered.

First, we quote from the admitted testimony of Dr. LeRoy and Captain McCann, Master of the *American* at the time. (The testimony of Mr. Rutland, general manager of the Barge Company, who appears to have been the Barge Company's representative with whom Dr. LeRoy talked, was not available, he having died before this suit was brought, nearly three years later.) Dr. LeRoy's testimony shows (1) what the lease agreement made was, and (2) what construction was given it by the parties as evidenced by both declarations and conduct. Captain McCann testifies to his instructions, understanding and conduct, particularly in recognizing the exclusive authority of the Red Cross to give orders regarding the boat, its direction and control, disposition and use. He and the mate, who was at the time of the mooring complained of on duty and in immediate charge of that work, give the details respecting the handling of the barges, their towing and mooring, all directly under the exclusive orders of the Red Cross.

After detailing the vast emergency work he was doing, which included the rescue of some 13,000 people from the flooded area, together with large quantities of live stock and other property, and the taking over from various sources of hundreds of barges, tow boats and other vessels, Dr. LeRoy was asked: "Q. Did you make any arrangements for the Red Cross to take over the Steamer *American* from the American Barge Lines? A. Yes, Sir,

we did." Note here the use of the comprehensive phrase "take over" the steamer.

We have heretofore summarized the conversation which Dr. LeRoy had with the representative of the Barge Company, in which he requested that the Steamer *American* be turned over to the Red Cross to be used generally by the Red Cross in the prosecution of this rescue work, and in which he represented, in effect, that the contract would be later prepared in accordance with the "usual and customary" terms.

Later on Dr. LeRoy was asked, and answered, as follows: "Q. I want to know whether or not you knew at that time what the usual provision was, or was not, that when a boat was leased the lessee took over the management and crew? A. Oh, they took over the entire boat just like it was, and went and ran it the same as if they had a new manager. In other words, we became the manager of the boat when they took it over to do what we wanted to do."

There followed an objection and some argument and several comments by the Court, without a clearly definite ruling. Then this question was asked: "Q. With reference to the management of the boat and crew that is taken over? A. The man who leases the boat takes care of the whole thing." Then followed another colloquy between counsel and the Court, who finally said:

"Just go by that point. Let him ask another question.

"Q. Just answer that point as to whether at the time you had this conversation you knew what the provisions were in the charter of the American Barge Line and other companies with reference to whether or not when a lessee chartered a boat it took over the management of the crew as well as the boat? A. I knew the custom, what was usually done, whether the provisions, or something

of that kind, is the correct word, I don't know just what the word means, but I knew the custom when a boat is taken over. Q. What was the custom?''

He was interrupted with another objection, which was finally thus stated: ''My objection is it is incompetent to prove what was done in the case of other boats. He says he does not know in this case, and it is utterly immaterial.'' The Court: ''Objection sustained.'' And the Court later added: ''The general custom may be proven in certain instances, but I don't think he can show the general custom in attempting to prove what the arrangement was in this specific instance. I think he ought to ask him what the arrangement or agreement was in this case so far as he knows.'' The Court finally framed the following question:

''Q. What arrangement or agreement was made at the time you say you took this boat *American* over for use, what was the arrangement or agreement? A. The agreement was I should take the boats and use them immediately and go to work in rescue work, and the details would be worked out equitably as usual with the Red Cross Business Outfit.'' He went on to say that this was an emergency situation and called for immediate action. Following another objection the Court said: ''He may state in answer to that question, I think, what was done with reference to taking over the boat, who was the boss of it and who ran it and just what happened.''

''Q. Answer that then? A. I had no personal contact with the crew. I would give an order. When we had two or three barges at the foot of President's Island, for example, they are tied up, and so forth, 'Bring them, gather them up and bring them in,' say to the foot of Monroe Street, and then notify this office. They will be loaded at once and further disposition will be made.

When you are in give us notification and the next task will be assigned right away. The boat would then go ahead, find the barges as described, untie them, bring them in to the foot of Monroe Street, let us say, or at other places that would be designated, tie them up. And then if there were some other things to do they would be told what and where and then when that was done that would be reported. The boats were under my direction tŏ do what was necessary . . . we would call the boat up to get in contact . . . sometimes by 'phone, we would get into communication with the Captain, and then ask that certain tasks be performed.

"Q. Then actually after the Red Cross took it over who gave orders? A. The orders would originate entirely from my desk, and usually through me.

"Q. Now thereafter did the American Barge Line give any orders to this boat? A. None that I know of."

Dr. LeRoy was then asked if the Red Cross took out insurance. An objection was interposed and sustained. Later on the witness was asked if he gave instructions to the Captain of the *American* with reference to the handling of the barges, the negligent mooring of which was the basis of this suit, and he was shown a signed order addressed "To Captain of Steamer *American*" respecting this matter. He said he had signed this order on behalf of the American Red Cross. This order read: "Remove two red barges now under cableway at Spang Chalfant dock. Take them to dock of Wolf River Transportation Company. Leave room at Wolf River dock for Steamer Yocono (which Red Cross was operating under lease) to tie up about six P. M. today."

Further on LeRoy was asked:

"Q. State whether or not you had the authority to give orders to the Master, or Captain, of the *American*

while it was working for the Red Cross? A. I had the authority delegated to me to give orders concerning the movements of all those boats, the *American* being one of them. All of the boats and all of the tow boats, and all of the other things were under my direction temporarily,'' etc.

''Q. Did you, or not, attempt to control the seamanship of the boat? I mean by that, the expert portion of it with reference to what channel should be taken or anything of that sort. A. Only in certain instances, if it were necessary to tell them where to go in certain unusual places. Sometimes there would be a place to go that we wanted to go back of levee, and I might give orders to go there, starting in at such a town, and then turning into the left of the levee, or something of that kind, which would be a particular order of where to go. But how to do it, I had—I didn't have to do that; that was up to the pilot and up to the Captain and people in charge of the boat.

''Q. You of course did not ride with the boat? A. No sir, I didn't do that, No, sir.

''Q. Did you have authority, or not, to discharge the Captain of the Steamer *American*, if in your discretion you should do so? A. Unquestionably, I would have had authority to do it, if necessary, in certain instances, but it never became necessary even to consider such a matter. But had it become necessary, without doubt I could have ordered any boat tied to the bank and the crew displaced immediately. A condition of that kind would apply in emergency more or less as it might in a military manner.

''Mr. Armstrong: Now if your honor please, just to keep the record straight, that is a conclusion of law and I object to it.

"The Court: You mean the last part?

"Mr. Armstrong: Yes, sir.

"The Court: Well, of course, with reference to the military orders, that is excluded. The rest of what he said is, I think competent." (The materiality of the admitted portion is obvious.)

"Q. Is that true with reference to your authority to discharge and or to give orders and direction with reference to the Captain and crew of the Steamer *American* at that time? A. I would have assumed the authority, if the exigencies demanded. . . . I could have ordered, and would have ordered an evacuation of the boat and the personnel to be set ashore if necessary."

On cross-examination, Dr. LeRoy was asked, among other things, if Captain McCann, who was Master of the *American*, had been in charge before it began to help out with the Red Cross work, to which he replied, "yes, sir, the whole crew and they stayed right on the boat. We just took the boat over where it was and set it to work." In answer to other cross questions Dr. LeRoy reiterated that he would "have certainly assumed the authority under the circumstances to remove the Captain and crew—for example, to explain myself—if it had turned out that they were unable to work, the crew or Captain had turned up drunk, in trouble, or something like that, I certainly would have put them on the bank, and then gotten a legal adjudication later." All through the cross-examination Dr. LeRoy stuck to the proposition that he had the right to say to the Captain, "You are not a safe man to do this work and you will have to stand aside." In other words, he reiterated with much emphasis his understanding or conception of the agreement under which he was operating to be that he had absolute control and dominion over this boat, its movements and

its crew. This was the construction which he definitely put upon the agreement under which he was operating.

Turning now to the testimony of Captain McCann, the Master of the *American*, he was asked, and made the following significant answers:

"Q. Were you in charge of the Steamer *American* as Master or Captain back in January, 1937? A. Yes, sir.

"Q. Did you receive any orders from the American Red Cross? A. Yes, sir.

"Q. When did you first begin to receive those orders? A. Well, along, I would say it was around noon when I got the first order from them.

"Q. Where were your orders to go—before that, had you received any instructions with reference to whether you were any longer in the employ of the American Barge Line? A. I did.

"Q. What were those instructions? A. That the boat was turned over to the Red Cross.

"Q. Were you turned over to the American Red Cross, and the crew? A. Yes sir, crew and everybody.

"Q. Did you agree to work for them thereafter? A. Yes, sir.

"Q. After the time you were turned over to the American Red Cross, up until the time you finished working for the American Red Cross, did you receive any orders or instructions from the American Barge Line? A. No sir."

Again he was asked, and answered:

"Q. From the time that the *American* was taken over by the American Red Cross up until the time the boat no longer worked with them, whose orders were you under? A. Under the Red Cross until they discharged her.

"Q. Did you, or not, obey the orders received from them? A. From the Red Cross?

"Q. Yes. A. All orders, yes sir.

"Q. Did anybody else other than the Red Cross attempt to give you orders? A. No, sir.

"Q. Would you have obeyed any orders that had been given by the American Barge Line while you were working for the Red Cross? A. Well, I would have told them they would have to take it up with the Red Cross, that they had the boat.

"Q. Did you, or not, consider the American Red Cross had the authority, if it wished to—

"Mr. Armstrong: I object to what he considered.

"The Court: Objection sustained.

"Q. Did you receive any orders of any kind from the American Barge Line during that period when you and the boat were working for the Red Cross? A. No, sir."

On cross-examination Captain McCann was asked:

"Q. If at any time during that five hours Mr. Rutland had got on board and said, 'Captain McCann you are to take this boat to Cairo,' you would have taken it there wouldn't you? A. Not unless he said I was released from the Red Cross.

"Q. If he told you that, though, you would, wouldn't you? A. I don't know about that.

"Q. Didn't you get your orders from him? A. I did at times, yes sir.

"Q. He was the one that turned you over to the Red Cross wasn't he? A. Yes, sir.

"Q. He was the one that turned you loose? A. I would have to get an order.

"Q. You would have accepted what he said about it, wouldn't you? A. I suppose I would."

One insistence made for the plaintiff below was that the right to control in matters of navigation was never

vested in the Red Cross, and Captain McCann was asked on this point:

"Q. The navigation of the boat was left to the Master, or the Mate, who is in charge, and the way he tied the barges and the way you fasten them up was left to them, isn't that right? A. Yes, sir.

"Q. So, of course, the operation of the boat, and the way the barges were tied, that was under the supervision of the men in charge of the watch at that time, wasn't it? A. Yes, sir.

"Q. Who was the man in charge of the watch? A. I would say the Mate."

On re-examination Captain McCann was asked:

"Q. Now you were asked with reference to your control over navigation, and I believe you stated that so far as navigation was concerned you were in control. Suppose Mr. Rutland, the General Manager of the American Barge Line, was on the boat and gave you instructions with reference to navigation, would you obey those orders, or use your own discretion? A. I would use my own discretion."

He further stated that on a steam boat, so far as navigation goes, that is a matter for the discretion of the Master, or pilot, and not the officers of the Company.

Witness Corbitt White, Mate on the *American*, was asked:

"Q. Who were you working for at the time you tied up this barge? A. The Red Cross.

"Q. During the time that you were working on the *American* during this operation you have just indicated (He had been describing the tying up of the barges that got away) did you receive any orders from the American Barge Line? A. No, sir.

"Q. Who did your orders come from? A. Red Cross, what orders I got.

"Q. Sir? A. What orders I got come from the Red Cross.

"Q. Was Captain McCann out on the barge with you at any time while you were tying it up? A. No, sir."

█ We come now to consider some rules of construction applicable to contracts for vessels and particularly to the foregoing facts of the instant case. And, first, we quote from *United States* v. *Shea,* 152 U. S., 178, 14 S. Ct., 519, 522, 38 L. Ed., 403, the language of Mr. Justice BREWER, this general rule: "No technical words are necessary to create a demise. It is enough that the language used [as it may be interpreted by the conduct and declarations of the parties] shows an intent to transfer the possession, command, and control [to the charterer]." This statement from the *Shea* case is incorporated in the text of 24 R. C. L., pp. 1092-1094, in its summary of the distinguishing features of charters. This text, while noting that a presumption applies against a demise, recognizes that in construing the agreement the question must be "considered in connection with the nature of the service rendered," citing the *Leary* case, *supra,* and others.

█ We are dealing here with an oral agreement, technically termed a charter-party. As said in *The R. Lenahan, Jr.,* 2 Cir., 43 F. (2d), 858, at page 862, "in *American Steel Barge Co.* v. *Cargo of Coal* (D. C.), 107 F., 964, it was held that an oral agreement or charter is entitled to a liberal construction with a view of carrying out the real intention of the parties." This is in accord with the principle applicable in construing contracts generally, that the objective of construction is to arrive at the intention, what was in the contemplation of the parties. And in the same case, the Court stressed the

importance, as evidencing this intention, of looking to the conduct and actions of the parties when operating under the contract. The Court cited *Leary* v. *United States, supra,* and *United States* v. *Shea,* 152 U. S., 178, 14 S. Ct., 519, 32 L. Ed., 403, for the rule that, "the charter party must be taken in connection with the actions of the parties." The Court noted as important the recognition of "the right to determine the nature of her work, the right to order her for work at one place or another either for placing barges in the harbor or proceeding upon a towage transportation of merchandise, or remaining idle without in either instance consulting the general owner, thus establishing a *pro hac vice* ownership in the [charterer]" as distinguished from "a use for a designated service or single towage." Here we have an application of the rule of practical construction of a contract by the parties, which this Court holds determinative in cases of ambiguity. *Canton Cotton Mills* v. *Bowman Overall Co.,* 149 Tenn., 18, 257 S. W., 398, 402. In the *Canton Mills* case this Court approved this statement of the rule of practical construction: "The interpretation given by the parties themselves to the contract as shown by their acts will be adopted by the court, and to this end not only the acts, but the declarations of the parties may be considered." 8 Williston on Contracts, par. 623, citing many authorities, including *State* v. *Board of Trust,* 129 Tenn., 279, 329, 164 S. W., 1151. See, also, *Chicago* v. *Sheldon,* 9 Wall., 50, 19 L. Ed., 594; *Yowell* v. *Union Cent. Life Ins. Co.,* 141 Tenn., 70, 90, 206 S. W., 334. The importance of this rule in its bearing on the facts of the instant case, heretofore narrated, is obvious. Its application is practically determinative of the controversy.

In the case of *United States* v. *Shea,* it is further observed in the opinion, pertinent here, that, ''It has frequently been held that furnishing supplies and appointing a master and crew and paying them did not alter the primary relations between the parties.'' In the *Shea* case, *supra,* Mr. Justice BREWER said, on this point: ''We think little significance is to be attached to the provisions in reference to furnishing a crew or supplying fuel. They were matters of detail, affecting the price to be paid, but throwing no particular light on the question of hiring or control.''

In this same case the Court also said: ''That the time for which the vessels were to be employed might be limited by the wishes of the government does not affect the question as to whether, while so employed, they were to be under its exclusive control and management. A demise may be for a day as well as for a year, and may be terminable at the will of the lessor.'' Proceeding, and stressing that the essential thing is to construe the agreement correctly in connection with the actions of the parties thereunder, the opinion reads: ''Not only this, but the conduct of the parties in the execution of the contract removes all obscurity as to its scope and meaning. As the findings show, the vessel, the James Bowen, was furnished by petitioner [the owner], and was accepted and used by the defendants [the charterers]. During the time of its use it was under the exclusive management and control of the defendants. The very condition resulted which is the purpose and effect of a demise,—the transfer of the exclusive possession, management, and control.''

As in that case, so in this, the ''conduct of the parties in the execution of the contract removes all obscurity as to its scope and meaning.'' The language of Mr. Justice

BREWER describes exactly the situation in the instant case.

 Further discussion of the law and facts of the case is unnecessary. The admitted proof clearly shows that the lease plan contemplated and the conduct of the parties demonstrated a demise, that is, a vesting of ownership *pro hac vice*—for the occasion—of the *American* in the charterer, with the result that the defendant Barge Company, here petitioner, was not the responsible master when the tort was committed, and this is the more conclusively apparent with the rejected testimony considered, as we think it should be.

For the reasons indicated, the petition must be sustained and the judgment of the Court of Appeals is reversed and the suit dismissed.