CAMPBELL et al. v. AMERICAN LIMESTONE CO.

Civ. A. 1509.

United States District Court
E. D. Tennessee, N. D.

Nov. 5, 1951.

8. 2 Cir., 178 F.2d 921, certiorari denied 339 U.S. 912, 70 S.Ct. 571, 94 L.Ed. 1338, rehearing denied 339 U.S. 939, 70 S.Ct. 672, 94 L.Ed. 1356.

Anderson & Snepp, Knoxville, Tenn., for plaintiffs.

Frantz, McConnell & Seymour, Knoxville, Tenn., for defendant.

DARR, Chief Judge.

This case was heard on motions for summary judgment made by both parties.

The plaintiffs as successors in interest of the Campbell & Deane Company, a corporation, sue the defendant for $28,880.06 with interest from July 5, 1945 as royalties under a sublease on quarry property in Knox County, Tennessee. The royalties claimed are for the year commencing April 1, 1944 and ending March 31, 1945.

The parties involved will be referred to herein as follows: The plaintiffs, including their predecessor corporation, as Campbell-Deane; the defendant as American; the Holston Quarry Company as Holston; the successor in interest to Holston Quarry Company as McCroskey; the quarry owned and leased by Campbell-Deane as Straw Plains Quarry; and the quarry owned by American Zinc Company of Tennessee as Mascot Mines.

The claim sued on originated under the following circumstances:

On October 15, 1924, Campbell-Deane leased the Straw Plains Quarry to Holston for a period of 50 years, with royalties to

be paid of 5¢ per ton for stone quarried and shipped from said mine, and with a minimum royalty of $3600 per year, or a penalty minimum of $9000 per year, the royalties to be payable 90 days after the end of the calendar month in which the stone was shipped. The lease was subject to cancellation by lessee on 6 months written notice and by the lessor for default on 60 days written notice.

On April 1, 1928, Holston subleased to American the Straw Plains Quarry for a period of 20 years, and simultaneously an amendment was made to the Campbell-Deane lease to Holston to conform the royalties payable under the Campbell-Deane-Holston lease to those to be paid under the Holston-American sublease.

Inasmuch as American was also handling stone quarried from the Mascot Mines, the amendment to the Campbell-Deane lease and the Holston sublease both provided that no royalties would be paid on the first 300,000 tons of chatts; but that on all stone mined and sold by American, in excess of 300,000 tons, either from the Straw Plains Quarry (owned by Campbell-Deane) or from any other property (including the Mascot Mines) royalties should be paid as follows: For the first 400,000 tons, 5¢ per ton; for the next 100,000 tons, 4¢ per ton; for the next 100,000 tons, 3¢ per ton; for the next 100,000 tons, 2¢ per ton; and for all in excess of the above amounts per year, 1¢ per ton. The minimum royalty was increased to $8000 per year.

The above royalties for the 20 year period covered by the sublease, which American was obligated to pay Holston under the sublease and which Holston was to pay Campbell-Deane under the original lease as amended, were thus identical.

Under the amendment to the Campbell-Deane-Holston lease, accrued rents or royalties were payable on the 25th day of the calendar month succeeding the quarterly period in which the royalty accrued.

Under the Holston-American sublease, the accrued rents or royalties were payable on the 20th day of the month.

The amendment to the Campbell-Deane lease provided that the changed royalties should be paid "so long as the aforesaid lease this day made between the lessee (Holston) and said American Limestone Company shall continue to be in effect". It also provided that "at the expiration, from whatever cause, of the said sublease from the lessee (Holston) to said American Limestone Company, the rents and rates of royalties provided for in the aforesaid lease between the parties hereto dated October 15, 1924, shall be and become effective from the date of said expiration until the end of fifty (50) years from said October 15, 1924". (Parenthesis supplied)

Under the provisions of the sublease, the sublessee was given the privilege of cancellation on giving 6 months' notice in writing to the sublessor; and the latter might cancel for 60 days default by giving the sublessee written notice thereof.

The sublease was subject to automatic cancellation if the Campbell-Deane-Holston 50 year lease should be canceled within the 20 year period of the sublease.

McCroskey subsequently, on June 17, 1941, acquired all of the interest of Holston in the lease from Campbell-Deane of October 15, 1924.

The parties operated without incident under these contracts from April 1, 1928 to the early part of 1944. The procedure generally followed was for American to remit to Holston (or later to McCroskey) the monthly royalties; and Holston or McCroskey would remit to Campbell-Deane. Payments consisted for the most part of the minimum royalty and were usually sent in quarterly installments. If there were royalties due in excess of the minimum, a settlement would be made following the annual rental period. Sometimes this would be included in the last quarterly payment.

Uniformly, however, Campbell-Deane was paid by its lessee, Holston or McCroskey, except the final payment of $4000 made on July 3, 1945 by American as the balance of the minimum for the year ending March 31, 1945.

Early in 1944, McCroskey began making demands on American for an adjustment, claiming that American owed him substantial sums for previous years' operation. It

is not shown here whether McCroskey's claims were based on his partnership agreement with American, or on unpaid royalties on the sublease. In any event, American began negotiations with McCroskey for a settlement, and in July 1944 proposed to Campbell-Deane an arrangement looking to a cancellation of the original 50 year lease on the Straw Plains Quarry, which would effect at the same time a cancellation of the McCroskey sublease. And American suggested a direct lease from Campbell-Deane to it. The purpose of this arrangement was apparently twofold, viz: (1) To dispose of McCroskey and (2) to obtain a reduction in the minimum royalty payable under the sublease.

Negotiations were carried on over a period of several months, when in the fall of 1944, the plan was changed; and American then sought a new lease from Campbell-Deane to McCroskey, in lieu of the original 50 year lease to Holston of October 15, 1924. And McCroskey in turn was to execute a sublease to American. Negotiations for such leases continued through 1944 and until March 1945, when American, who was then confronted with an ultimatum from McCroskey for a settlement, abandoned its hope of obtaining a new lease from Campbell-Deane and proceeded to make settlement with McCroskey.

During all of these negotiations over a period of months, American had intended to make the contract changes effective as of April 1, 1944, the beginning of the fiscal year. That date was inserted in several of the drafts of proposed leases, and must have been observed by Campbell-Deane. No objection to the proposed retroactive date was expressed in the letters passing between the negotiators.

The settlement between McCroskey and American was concluded on or about March 25th, and the papers actually signed on March 27, 1945. They were predated March 31, 1944. The effect of the settlement was that: (1) The sublease dated April 1, 1928, from Holston to American was canceled. (2) By virtue of that cancellation, the amendment dated April 1, 1928 to the parent lease of October 15, 1924, between Campbell-Deane and Holston was automatically terminated; and the 50 year Campbell-Deane-Holston lease was restored to its orginal terms. (3) The operating partnership lease between McCroskey and American was canceled, and a general receipt and release was executed. (4) McCrosky executed a new sublease to American for the Straw Plains Quarry, under the original parent lease for 50 years from Campbell-Deane to Holston. This sublease was for 20 years, to expire April 1, 1963, with the option to American to extend the sublease to October 15, 1974, upon payment of $25 per contract year. As consideration for this sublease, American was to pay McCroskey $10,000 per year, commencing April 1, 1944, and annually thereafter until the sum of $100,000 had been paid to McCroskey, which payments were to be "an absolute obligation * * * regardless of whether said quarry is operated or not * * * and regardless of whether or not the said lease from Campbell and Deane Company shall be terminated". (5) As a part of the instrument of "General Receipt and Release", executed by McCroskey and American, American assumed and agreed to pay and discharge all of the obligations imposed by said Campbell & Deane Company lease of October 15, 1924.

The aforesaid agreement and settlement between McCroskey and American were made without any notice to Campbell-Deane; and the first information Campbell-Deane had of the McCroskey settlement and the cancellation of the amendment to the Campbell-Deane 50 year lease to Holston was contained in a letter to Mrs. R. S. Campbell dated April 2, 1945, by Charles M. Seymour, attorney for American, giving notice of these transactions. On July 5, 1945, Mr. Seymour sent a check to Campbell-Deane for $4000 with a letter which said that the check was "balance of minimum royalty of $8000, payable under contract of April 1, 1928" between Campbell-Deane and Holston; and "the balance due of said minimum royalty for fiscal year ended April 1, 1945". These statements were also written in the face of the check.

The letter also said, "This pays all of the balance due under the above agreement of

April 1, 1928 between Campbell and Deane Company and Holston Quarry Company".

This latter statement was interpreted by R. S. Campbell, Jr., chief representative of Campbell-Deane, and by O. W. Hendrix, bookkeeper and treasurer of Campbell-Deane, to refer to and mean only the balance of minimum royalty due for the annual period.

The check was accepted and no claim was made for additional royalties against any one until May 1950, when plaintiffs learned that additional royalties were earned during the fiscal year April 1, 1944—April 1, 1945, and thereupon made claim against American.

In the meantime, after the above-mentioned settlements were made, American on January 15, 1946 purchased from Campbell-Deane the Straw Plains Quarry property for $35,000 cash, pursuant to 90 day options therefor given by Campbell-Deane to American on July 27, 1945 and November 25, 1945. The second option was given because Campbell-Deane did not desire to transfer title under the first option until after January 1, 1946. At the time the sale was completed the royalties accruing under the lease of October 15, 1924 were adjusted; and no mention was made of any delinquent royalties for the fiscal year ending April 1, 1945.

At the time American paid Campbell-Deane $4000 for balance of minimum royalty for the fiscal year ended April 1, 1945, it advised Campbell-Deane in Mr. Seymour's letter of April 2, 1945 to Mrs. R. S. Campbell in effect that the amendment of its lease which was made on April 1, 1928 calling for a minimum royalty of $8000 had been automatically terminated by the Mc-Croskey-American settlement "as of" April 1, 1944; that the minimum royalty under the lease had therefore reverted to the original minimum of $3600; and that "this is to confirm what I have heretofore told you,—that it is not the intention of Mr. McCroskey or the American Limestone Company to ask for an adjustment or repayment by The Campbell and Deane Company for the year 1944 of the difference between the payment of $8000.00 as made and the $3600.00, as provided in the agreement of October 15, 1924".

The court makes the following resume of the facts, as condensed from the foregoing detailed statement.

(1) Campbell-Deane, on October 15, 1924, executed a 50 year lease on the Straw Plains Quarry to Holston, wherein the basic minimum royalty on stone quarried from the premises was $3600 per year.

(2) On April 1, 1928, Holston gave to American a 20 year sublease on the quarry, wherein there was a minimum royalty payable of $8000 per year. The tonnage royalties excluded the first 300,000 tons handled by American, and then provided a graduated price of 5¢ to 1¢ per ton on all stone handled in excess of 300.000 tons, either from the Straw Plains Quarry, *or otherwise.*

(3) On April 1, 1928, concurrently with the execution of the sublease to American, the 50 year lease between Campbell-Deane and Holston was amended to provide for the same royalties as called for in the sublease.

(4) On March 27, 1945, the amendment to the Campbell-Deane-Holston lease was automatically terminated, the agreement effecting the termination being made retroactively effective March 31, 1944. Campbell-Deane was not a party to and not currently advised of the termination agreement.

(5) McCroskey paid the first two quarterly installments of $2000 each on the minimum royalty due Campbell-Deane for the fiscal year—April 1, 1944 to April 1, 1945, and American on July 5, 1945 paid the remainder of the minimum royalty for said period, being the sum of $4000. This last-mentioned payment was the only one made by American to Campbell-Deane under the sublease.

(6) When American and McCroskey canceled the original sublease of April 1, 1928, and executed the general receipt and release, and the new sublease on March 27, 1945 (dated retroactively as of April 1, 1944), American assumed certain obligations and made certain indemnitory agree-

ments, as will be hereinafter more fully set out.

(7) The first payment of $10,000 made by American to McCroskey in connection with the settlement between them and the cancellation of the April 1, 1928 sublease was made to cover the annual rental or royalty period ending April 1, 1945.

(8) From April 1, 1928 to the half year of 1944, all royalty payments due Campbell-Deane under the lease of October 15, 1924 were made to it by Holston or McCroskey.

Payments by American under its sublease were made to Holston or to McCroskey.

(9) Following notice of the expiration of the amendment of April 1, 1928 to the original lease of October 15, 1924, (which expiration had the effect of restoring the minimum royalty of $3600 due Campbell-Deane) Campbell-Deane had no knowledge until some time in the year 1950 that additional royalties above the minimum of $8000 had accrued prior to March 31, 1945. Prior to 1950, Campbell-Deane made no effort to ascertain the status of the royalty account, either from American or McCroskey.

McCroskey died on or about May 14, 1946; his administrator qualified May 17, 1946; notice for creditors was published May 18, 1946. No claim was filed for the royalties involved here.

(10) On January 15, 1946, American purchased from Campbell-Deane the property comprising the Straw Plains Quarry, for a cash consideration of $35,000, and made an adjustment of accrued royalties. At that time Campbell-Deane made no claim for any unpaid royalties for the year April 1, 1944—April 1, 1945.

The plaintiffs' suit is based upon the claim that:

1. Royalties of $28,880.06 are due for the year April 1, 1944 to April 1, 1945 in excess of the minimum paid.

2. American is liable therefor: (a) By reason of its assumption of payment, (b) by reason of its occupancy of the demised premises, and (c) by reason of it being a third party beneficiary to the sublease of Holston to American, dated April 1, 1928.

The defendant denies liability on the grounds that:

1. Royalties were terminated as of March 31, 1944 by instruments executed on March 27, 1945, which instruments were made retroactively effective with the knowledge and consent of the plaintiffs, to carry into effect informal agreements previously made.

2. Accord and satisfaction was effected by the issuance and acceptance of the check for $4000, dated July 3, 1945, as settlement in full for accrued royalties.

3. American is not liable to the plaintiffs for any royalties, in the absence of a contract liability therefor.

4. Plaintiffs are guilty of laches in not making a claim for the royalties sued on at the time of purchase of the property and settlement of royalties on January 15, 1946.

5. The statute of limitations of 6 years bars the first quarterly installment of royalties sued for.

6. Defendant denies the assumption of royalty payments; denies that Campbell-Deane was a third party beneficiary of the sublease of April 1, 1928; and denies generally that it owes the plaintiff anything.

7. Defendant says further that the royalties for the period involved could not be $28,880.06, but would be only $9,745.31 if any royalties are properly chargeable. But defendant denies any liability therefor.

The court is of the opinion that full royalties accrued during the annual period involved. The amendment of April 1, 1928 to the Campbell-Deane lease to Holston of October 15, 1924 remained in force until the sublease from Holston to American was canceled; and the cancellation could not be made retroactive so as to affect Campbell-Deane without their consent. 17 C.J.S., Contracts, § 379, p. 871.

The court finds no bad faith indicated on the part of American in predating the cancellation, inasmuch as negotiations had been carried on between Campbell-Deane, McCroskey and American for months prior

to March 31, 1945, and in several drafts of proposed instruments to change existing leases, the effective date of March 31, 1944 had been used, and no objections indicated by Campbell-Deane. But the amendment to the lease of October 15, 1924 remained effective so long as the sublease of April 1, 1928 by Holston to American continued to be in effect; and the Court is of the opinion that in so far as the rights of Campbell-Deane are involved, the sublease was not canceled until the parties reached an agreement and executed the cancellation instruments on or about March 27, 1945. There was not even an oral agreement until in March 1945.

■ Furthermore the leases indicate that they are for annual periods, and it is conceded that the sublease continued beyond the anniversary date of April 1, 1944. A hold over by the tenant creates liability for another like term. Lewis v. Bringhurst Reid Co., 155 Tenn. 177, 290 S.W. 972.

■ The court is further of the opinion that Campbell-Deane was not a third party beneficiary under the Holston-American sublease of April 1, 1928. The sublease was executed contemporaneously with the amendment to the parent lease of Campbell-Deane to Holston dated October 15, 1924. Campbell-Deane was a party to the amendment, and the sublease was by reference made a part of the amended lease. Campbell-Deane being thus a party to the contracts is presumed to have included therein any benefits which it sought. Nothing appears in the record to indicate that the parties, even Campbell-Deane, intended any such benefits as are now claimed. Throughout the years of subsequent operations, Campbell-Deane was content to receive payments from its contract lessee, and at no time claimed or intimated that American was obligated to make payments direct to it. The sublease was in no sense made for the benefit of Campbell-Deane. Campbell-Deane's own contract provided for the benefits accruing to it. Before a party may sue on a contract to which he is not a party, it must appear that the contract was made for his benefit. Carson Pirie Scott & Co. v. Parrett, 346 Ill. 252, 178 N.E.

498, 81 A.L.R. 1262; Title Guaranty & Trust Co. v. Bushnell, 143 Tenn. 681, 228 S.W. 699, 12 A.L.R. 1512; Ruohs v. Traders Fire Insurance Co., 111 Tenn. 405, 78 S.W. 85.

■ The court finds that American is not liable to Campbell-Deane by virtue of its occupancy of the Straw Plains Quarry. It was entitled to occupy the property under its sublease; and any rents or royalties attributable to such occupancy would be owing to Holston or McCroskey from whom its rights were acquired as provided by the sublease. The parties themselves so construed the leases. Campbell-Deane consented to the sublease—in fact the sublease was by reference made a part of the Campbell-Deane-Holston lease. The lease contracts are controlling and are to be interpreted according to the intention of the parties.

Furthermore, American has paid the royalties for the period to McCroskey to whom it was obligated.

Again, it is clear that there was no privity of contract between Campbell-Deane and American.

While, as set out above, the court is of the opinion that royalties accrued and were payable to Campbell-Deane for the year April 1, 1944 to March 31, 1945, the court finds no ground upon which American can be liable therefor.

American's obligations were under a sublease from Holston, whereunder rents and royalties were payable to Holston. The obligations of Holston to Campbell-Deane under the lease of October 15, 1924, as amended April 1, 1928, were unaffected by the sublease; and that lease as amended was not assigned to American. That lease was for 50 years, while the sublease was for 20 years.

■ Where a lessee of property executes a sublease, the sublessee is not liable to the lessor in the absence of statutory requirements or the assumption by the sublessee. Brummitt Tire Co. v. Sinclair Refining Co., 18 Tenn.App. 270, 75 S.W.2d 1022; 52 C.J.S., Landlord and Tenant, § 529(b), p. 341; 32 Am.Jur. 342; 2 Thomp-

son on Real Property, sec. 1644; 1 Tiffany on Real Property, sec. 124.

To constitute an assignment, of a lease, as distinguished from a sublease, the instrument of assignment must convey the whole term and leave no interest or reversionary interest in the assignor. Brummitt Tire Co. v. Sinclair Refining Co., supra; Stone v. Martin, 185 Tenn. 369, 206 S.W.2d 388.

That a sublease arrangement was intended by the parties is shown by their operating procedure for 16 years, wherein American paid the royalties to Holston under the sublease, and Holston paid the royalties to Campbell-Deane under the parent lease.

But the plaintiffs say that American has assumed payment of the royalties. The assumptions referred to are those contained in (1) General receipt and release, executed on March 27, 1945, as of April 1, 1944, and (2) Lease indenture of same date. Both instruments were executed by McCroskey and American.

In the first instrument, Article 3 provides, "That so long as this sublease (the second instrument, supra) or extension thereof is in effect, American assumes and does hereby agree to pay and discharge all of the obligations imposed by said Campbell and Deane Company lease of Oct. 15, 1924, as fully as though American were the lessee named in said lease * * *." (Parenthesis added)

Then follows an agreement to indemnify McCroskey from any loss, cost or damage from failure to perform the aforesaid agreement.

In the next paragraph of this Article, American further agrees "to indemnify and save harmless the said McCroskey from any loss, cost or damage by reason of any liability of McCroskey growing out of the aforesaid lease of October 15, 1924, between the said Campbell and Deane Company and Holston Quarry Company, *and any amendments thereto;* and the aforesaid lease of April 1, 1928 between said Holston Quarry Company and American, *and any amendments thereto*". (Emphasis added)

In the second instrument mentioned above (the sublease from McCroskey to American) the second preliminary clause reads: "Whereas, the said Holston Quarry Company by agreement dated the 17th day of June, 1941, assigned all of its right, title and interest in and to said lease to W. H. McCroskey * * *."

In Article 3, it is provided that American "also agrees so long as this sublease or any extension thereof remains in effect, to assume and pay to the said Campbell and Deane Company all the rents, royalties, * * * contained in the aforesaid lease from said Campbell and Deane Company".

The plaintiffs call attention to the fact that in the first quoted language above, in the second instrument, the words "said lease" admittedly included the lease as amended on April 1, 1928; and that in Article 3, when American assumed the rentals "contained in the aforesaid lease", it must have also included the rents provided in the amended lease. And it is thus insisted that American assumed payment of the rents and royalties sued for herein.

It is to be noted, however, that Article 3, supra, begins: "So long as this sublease or any extension thereof remain in effect". This language clearly imports prospective obligations and not obligations already fixed to be paid in the future.

In Article 5 of said instrument, American is appointed agent of McCroskey, with all his rights, at any time it (American) so desires, to exercise the option given to the lessee in the aforesaid lease from Campbell & Deane Company to terminate said lease by giving written notice, etc. Here, obviously, "the aforesaid lease" must relate to the original lease of October 15, 1924, and not to any amended lease, because the amendment was then canceled.

Furthermore, the language of this sublease must be construed in the light of the provisions on the same subject in the companion instrument, "General Receipt and Release". These instruments were executed at the same time, and it is hardly conceivable that their provisions were intended

to be contradictory. It is clear that under Article 3 of "General Receipt and Release", American assumed only the rents and royalties under the original lease of October 15, 1924. The indemnity agreement in the last paragraph of Article 3 relates to any loss, cost or damage growing out of the aforesaid lease of October 15, 1924 "and any amendments thereto", thus plainly indicating a distinction between the original lease and the amendment.

The intention of the parties is thus too clearly stated to admit of any doubt. Where any obligations in the "amendment" to the original lease were to be affected, the amended lease was referred to.

■ The assumption of rental or royalty obligations cannot be extended beyond the plain intent of the parties as expressed in the instruments. The court cannot make a contract for the parties. Stone v. Martin, supra.

The indemnity agreement by American in the general receipt and release, with respect to McCroskey's liability under the lease of October 15, 1924, *as amended*, cannot, of course, amount to an assumption of any such obligations until McCroskey has sustained "loss, cost or damage by reason of any" such liability. Such obligation, however, if it existed, would · inure to McCroskey and not to the plaintiffs.

The plaintiffs' brief complains that American settled with McCroskey, without notice to the plaintiffs, agreeing to pay $100,000 in settlement of his claims with respect to royalties; and that plaintiffs are entitled to share in the funds paid McCroskey in settlement of royalties for previous years of operations; and that plaintiffs were therefore entitled to notice of such settlement before or when made. It must be borne in mind that the settlement involved also the cancellation of an agreement whereunder McCroskey was entitled to 50 per cent of the profits on certain operations up to $100,000 per year, and 40 per cent on the profits above that sum.

Just what the settlement was intended to cover is not disclosed. It is shown on the face of the instrument that the first payment of $10,000 was allocated to rent "for the year ending April 1, 1945", which is the period of time for which royalties are sought in this litigation. Payment by American of such royalties to McCroskey is wholly consistent with American's sublease. It has thus paid to McCroskey, as it was obligated to do, the royalties for the very period for which it is being sued herein; and has obtained McCroskey's receipt in full therefor. It is not shown that any part of the funds involved in the settlement were to be applied to royalties in previous years.

It seems sufficient, however, to call attention to the fact that the complaint seeks no accounting for previous years; and no claim is made that Campbell-Deane is due any additional royalties for previous years.

The defendant says further that when American bought the Straw Plains Quarry on January 15, 1946, pursuant to options granted by the plaintiffs in July and November 1945, and adjusted the royalties due up to that date, that the plaintiffs adjusted the rents without making any claims of additional royalties or including them in the adjustment then made. Defendant says that plaintiffs are therefore guilty of laches in failing to demand payment of further royalties until May 1950, and that such laches constitute a bar to this suit.

■ The settlement then made was in the nature of a stated account. 1 C.J., p. 678, sec. 249; 1 C.J.S., Account Stated, § 1. It is not necessary that such account be in any particular form * * * if it indicates that a final settlement is intended. Id., sec. 254, 1 C.J.S., Account Stated, § 21.

■ Equity may refuse to relieve against mistakes where the party sought to be charged had ample means of discovering all the facts. 1 C.J., p. 714, sec. 353, 1 C.J.S., Account Stated, § 51.

■ Equity will not open accounts after the lapse of such a time as that the evidence and the means of arriving at a just conclusion may be impaired, especially where the death of parties has intervened. 1 C.J., pp. 713 and 714, sec. 350, 1 C.J.S., Account Stated, § 51.

While the court might be reluctant to hold that the plaintiffs had been guilty of such laches in this case as would bar their claim, their delay in making a claim until after the death of McCroskey is confirmatory of the lack of equity in the present suit. No valid excuse is shown why they failed to ask for a final settlement from McCroskey. Had they at the time of the sale of the quarry to American made any inquiry or demand about the royalties now claimed, American could have given them the facts and the royalties could have been collected from McCroskey, who owed them.

American cannot be penalized by their mistaken belief that McCroskey would report any excess royalties and settle therefor. It is unfortunate that plaintiffs did not inquire. There was no concealment by American and no obligation on American to report or pay the royalties to plaintiffs.

In view of the foregoing conclusions, it is not necessary to refer to other questions presented in defendant's answer. The court feels, however, that it may be desirable for the record to announce findings thereon.

The defendant says that inasmuch as rents and royalties were by the terms of the sublease payable in quarterly installments, on the 25th day of the calendar month succeeding the quarterly period in which they accrued, that if any royalties are due the plaintiffs, the first quarterly installment is barred by the 6 year statute of limitations. While the lease does so provide, it was obviously not the intention of the parties that it should be literally construed. Quarterly installments were not always made or required; and no interest was ever demanded on installments not so paid. When such installments were in fact made, they were seldom, if ever, made according to the literal provisions of the lease. As an indefinite latitude was permitted by the parties, the court concludes that it was not the intention that the installment dates were intended to be a day certain, which would put into operation the statute of limitations.

A course of conduct pursued by the parties is the very strongest evidence of what the contracting parties originally intended. American Barge Line Co. v. Jones & Laughlin Steel Corp., 179 Tenn. 156, 163 S.W.2d 502; Frierson v. International Agricultural Corp., 24 Tenn.App. 616, 148 S.W.2d 27.

The interpretation of a contract by the parties will be adopted by the court. Fidelity-Phenix Fire Ins. Co. v. Jackson, 181 Tenn. 453, 181 S.W.2d 625.

The defendant also pleads accord and satisfaction, resulting from acceptance of the check for $4000 issued by defendant to plaintiffs, with a paid in full legend thereon, and from the contents of the letter transmitting the check.

The legend on the check related only to the balance of the minimum royalty; and the import of the letter was to the same effect. While it was stated in the letter, after quoting the same language as written in the check, that the check "pays all of the balance due under the above mentioned agreement of April 1, 1928", this was obviously intended to refer to the balance of the minimum royalty, as set out specifically in the first paragraph. It was so understood by Mr. Hendrix, treasurer, and by Mr. R. S. Campbell, Jr., the principal stockholder. These persons both say that there was a distinction always made in remittances—whether they were for minimum royalty or tonnage royalty; and they understood that the letter referred only to minimum royalty.

The court is of the opinion that the acceptance of the check under the circumstances did not effect an accord and satisfaction. The conditions attached to it were not intended or interpreted either by the maker or by the payee to refer to the royalties involved. This would not amount to an accord and satisfaction. Lytle v. Clopton, 149 Tenn. 655, 261 S.W. 664; Helms & Willis v. Unicoi County, 166 Tenn. 639, 64 S.W.2d 200.

In saying that they did not construe Seymour's letter to relate to any royalties except the minimum royalties, Campbell and Hendrix concede that they were not misled as to additional royalties. Any report of such additional royalties, and remittance

therefor, if later due, would have been due from McCroskey from whom they had been previously obtained through the years. The court finds no obligation on American to report thereon to Campbell-Deane or to remit therefor.

Both parties having filed motions for summary judgments concede that there is no issue of fact to warrant a trial. This is quite persuasive with the court and the court accedes thereto.

The motion for summary judgment filed by the plaintiffs is dismissed and the motion for summary judgment filed by the defendant is sustained and a judgment awarded to the defendant thereon.

This opinion will serve as the findings of fact and conclusions of law.