## MANUFACTURERS FINANCE CO. v. B. L. JOHNSON & CO. et al.

Eastern Section.    October 3, 1931.

Petition for Certiorari denied by Supreme Court, July 2, 1932.

Fowler & Fowler, of Knoxville, for plaintiff in error.

Cates, Tate, Smith & Long, of Knoxville, for defendant in error.

THOMPSON, J.    This cause originated in the Chancery Court of Knox County on a bill filed by the Manufacturers Finance Company against B. L. Johnson & Company and four individuals, seeking a recovery from B. L. Johnson & Company and said individuals for

certain sums of money collected by B. L. Johnson & Company on about $8,000, of accounts which had been previously assigned to the Manufacturers Finance Company, and which had not been remitted to it by B. L. Johnson & Company, as provided by contract.

By cross-bill, B. L. Johnson & Company sought to recover of the Manufacturers Finance Company about $8,000, alleged usurious interest paid to said Manufacturers Finance Company during a period of something over three years.

The Chancellor rendered a decree dismissing the cross-bill and awarded the Finance Company a recovery against Johnson & Company and the individuals (who were guarantors on the contract, and a surety on a bond) for the sum of $4,981.91, and the costs of the cause.

Johnson & Company has filed the record for writ of error and has assigned errors.

The Finance Company was a corporation organized under the laws of Delaware, but with its principal office and place of business at Baltimore, Maryland.

Johnson & Company was a corporation organized under the laws of this State and with its principal place of business at Knoxville. It was engaged in the business of manufacturing and selling candies.

There were three contracts entered into between the Finance Company and Johnson & Company, the first on September 1, 1923, the second on January 12, 1924, and the third on August 24, 1925. Each contract superseded the previous contract—the occasion for the execution of the latter two contracts being a change in personnel of Johnson & Company and the desire of its previous officials to be relieved of liability as guarantors on the previous contract, and sureties on the previous bond given to assure the faithful performance of the contract by Johnson & Company. The liability enforced by the Chancellor was under the last contract.

Although the contracts purported to constitute sales of accounts by Johnson & Company to the Finance Company, the Chancellor construed them as constituting loans by the Finance Company to Johnson & Company with assignments of the accounts as collateral security. The Finance Company seems to acquiesce in this holding. The Chancellor held that the Finance Company had not breached the contracts, and that under the last one, Johnson & Company was indebted to the Finance Company in the sum of $4,981.91. After reviewing the evidence we are convinced that the Finance Company did not breach the contracts and that it made no charges against Johnson & Company and collected and retained no money that the contracts did not call for.

But treating the contracts as loans, the Finance Company did re-

ceive interest at a much greater per cent than the six per cent allowed by the laws of Tennessee, and the only serious question is whether Johnson & Company is entitled to recover this usurious interest.

Johnson & Company signed the contracts at Knoxville. Above their signature was the provision that ''This agreement shall not become effective until accepted by two duly authorized officers of second party (Finance Company) at Baltimore, Maryland.''

After the contracts had been signed (in duplicate) by Johnson & Company at Knoxville, they were sent to the Finance Company at its principal office at Baltimore, Maryland, where they were signed by the Finance Company's Treasurer and Vice President under the following:

''Accepted by Manufacturers Finance Company at Baltimore, Maryland,'' etc.

One of the signed duplicates was then returned to Johnson & Company at Knoxville.

The contracts are too lengthy to quote, but we will set out the way the business was handled, which was in accordance with the provisions of the contracts.

The Finance Company from time to time sent to Johnson & Company printed forms called ''Original Certificates of Indebtedness.'' From time to time and as Johnson & Company desired money, it would list on one of these forms a number of accounts receivable which it held against its customers for candy sold to them. After signing the form (which the Chancellor held was an assignment of the accounts as collateral security, rather than a sale) Johnson & Company would forward the same to the Finance Company at Baltimore, Maryland. Upon receipt of the form the Finance Company would deposit to the credit of Johnson & Company in a bank at Baltimore a certain per cent of the total of the accounts listed on the form. Johnson & Company could then check against this deposit. When the accounts would fall due Johnson & Company would collect from the customers, but instead of cashing the checks, money orders, etc., it would endorse them and then send them to the Finance Company at Baltimore, Maryland. The Finance Company would deposit said checks, money orders, etc., to its (Finance Company's) credit in a bank at Baltimore, and said checks, money orders, etc., would be sent out by said bank and collected through the usual banking channels.

After the assigned accounts had thus been paid and the money received by the Finance Company, said company would deposit to the credit of Johnson & Company in a bank at Baltimore, Maryland the remaining percentage to which Johnson & Company was entitled under the contracts, and Johnson & Company would check out the

same as it desired. About every six weeks the Finance Company would send one of its auditors to Knoxville, and he would examine Johnson & Company's books, accounts, etc., and see to it that the Finance Company's rights and interests were being fully protected and not encroached upon by Johnson & Company.

The first contract, i. e., the one of September 1, 1923, contained a provision to the effect that it, and all acts, transactions, agreements, certificates, assignments and transfers thereunder, and all rights of the parties thereto, should be governed as to their validity, enforcement, interpretation, construction, effect and in all other respects, by the laws and decisions of the State of Maryland. But the last two contracts contained the following: .

"As the second party (Finance Company) is a Delaware corporation it is further expressly agreed that these articles and all acts, transactions, agreements, certificates, assignments and transfers hereunder, and all rights of the parties hereto, shall be governed as to their validity, enforcement, interpretation, construction, effect and in all other respects, by the laws and decisions of the State of Delaware."

Since no part of the transactions involved between the Finance Company and Johnson & Company were referable in any respect to the State of Delaware, we think that notwithstanding the above quoted provision of the last two contracts, the laws of Delaware have no application whatever to the cause at bar.

But notwithstanding the contention of Johnson & Company to the contrary, we think that the Chancellor was correct in holding that the laws of Maryland govern the rights of the parties in the cause at bar. This, for the reason that the contracts were finally executed in Maryland and practically everything that was done under them was done in Maryland. We have considered Johnson & Company's contention that the contracts and method of transacting the business were a fraudulent scheme to evade the usury laws of Tennessee, but we do not think that this contention is well taken. The record shows that the Finance Company has been transacting this same business in the same way for fifteen years; that it does about one hundred million dollars of business a year; that it uses almost identically the same contracts, certificates, etc., as other companies doing a similar business; that it transacts business in almost all of the States of the Union; that the contracts, certificates, etc., used with Johnson & Company were on its usual and standard forms, etc. While the contracts show on their faces that the parties did not desire the laws of Tennessee to govern their rights, yet there is nothing in the contracts nor in the record to indicate a fraudulent scheme to evade any of the laws of this State. So, as stated, we think the Chancellor was

240

correct in holding that the rights of the parties should be governed by the laws of Maryland where the contracts were executed and where practically everything under them was done.

The applicable laws of Maryland were stipulated. Under them six per cent is ordinarily the legal rate of interest, but they contain the following: "No corporation shall interpose the defense of usury in any action at law or in equity."

The highest courts of the State of Maryland have construed the above quoted provision to mean that corporate borrowers and lenders may charge and pay any rate of interest agreed upon, and that a corporation cannot set up usury either as a defense or as a ground for recovery.

We have considered the contention of Johnson & Company that to apply the laws of Maryland to the cause at bar would violate both the public policy and the Constitution of this State, but we do not think that the same is well taken.

After considering the record and the various contentions made, we are convinced that the decree of the Chancellor was correct and the same will be affirmed, with costs.

Portrum and Snodgrass, JJ., concur.