**TENNESSEE ENAMEL MFG. CO. v. STOVES, Inc.**

No. 11288.

United States Court of Appeals
Sixth Circuit.

Dec. 4, 1951.

William Waller, Nashville, Tenn. (William Waller, Nashville, Tenn., on the brief; E. J. Walsh, George H. Armistead, Jr., and Waller, Davis & Lansden, all of Nashville, Tenn., of counsel), for appellant.

Kenneth Harwell, Nashville, Tenn. (Albert Williams, Kenneth Harwell, Nashville, Tenn., on the brief; Wilkes T. Thrasher, Chattanooga, Tenn., Williams, Cummings & West, Nashville, Tenn., of counsel), for appellee.

Before HICKS, Chief Judge, and ALLEN and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

The appellee, Stoves, Inc., a Louisiana corporation, brought this action against

Tennessee Enamel Manufacturing Company, a Tennessee corporation, for breach of an alleged oral contract whereby appellant agreed to sell appellee, at a cost price of $40,000, for delivery within one year from the date of the contract, five railroad carloads of gas heating stoves and furnaces of the Temco type manufactured by appellant. The complaint averred that the alleged contract was entered into orally during the month of January, 1948, "at an exact date unknown to the plaintiff"; and that appellant breached the contract on March 22, 1948, when it notified appellee that no gas heating stoves or furnaces would be shipped, none having been shipped to appellee at the time of this notice. After trial as a court action, judgment in favor of Stoves, Inc., for $7,500 was entered.

The District Judge stated that the case had been most difficult for him to decide, and that he thought probably he could decide it on the facts either way and be sustained. He commented that, from the evidence, he could not see that there was a definite and specific contract for the sale and purchase of five carloads of stoves, which was the alleged contract upon which the plaintiff brought this action; but that he did find there was "some commitment on the part of the defendant to furnish the plaintiff with five carloads of stoves for the year 1948 for its business for resale in the State of Florida."

The crucial findings of fact filed by the District Court are quoted in the margin.[1]

■ In our judgment, the District Court clearly erred in finding that any sort of

1. " * * * There was no contract between the plaintiff and the defendant as alleged in the complaint for the sale and purchase of five carloads of stoves. That is, there was no definite or specific contract which might be enforced in a court of law or equity, nor was there a contract for the sale and purchase of five carloads of stoves as used in the ordinary course of trade. There were no specifications mentioned as to models or types of stoves, and no definite prices on any definite quantities of stoves. The evidence as to whether there was an offer and acceptance was most indefinite. However, it had been agreed between the plaintiff and the defendant in 1947 that plaintiff should be defendant's distributor in Florida for the remainder of 1947, and in the last days of 1947 defendant's president, Mr. Evans, made a trip to New Orleans, combining business and pleasure, and at that time Mr. Evans, on behalf of the defendant, agreed that plaintiff's franchise or distributorship should continue in 1948 and made a commitment to plaintiff that defendant would furnish at least five carloads of stoves for the year 1948. It was not known at that time whether the scarcity of steel and shortage of stoves would continue and plaintiff was anxious to know whether or not it could get shipments of stoves. There was no written or oral contract about the length of the term the distributorship should run, but these distributorships usually ran from year to year, and that being the practice and custom in the business, the rules of usage

and custom apply and the distributorship was for the entire year 1948. The Court is aided in finding that there was a franchise or distributorship for the year 1948 by the fact that plaintiff went ahead and made plans to sell defendant's products for the year 1948, and mainly by the fact that in January, 1948, plaintiff had an exhibit at the Gasparilla Day Fair and displayed defendant's products among others, spending $900 on the exhibit, of which defendant contributed $100.

"3. The Court further finds that the agreement made by the plaintiff and the defendant to the effect that the plaintiff would be granted the exclusive distributorship franchise for the State of Florida during the year of 1948 and that the defendant would furnish the plaintiff with at least five carloads of stoves, was made in the offices of Stoves, Inc., New Orleans, Louisiana, and that the same was a Louisiana contract. The stoves to be furnished by plaintiff were to be manufactured in the State of Tennessee and they were to be distributed by the plaintiff in the State of Florida.

"4. In March of 1948 the contract for the distributorship franchise of Stoves, Inc., was unlawfully breached by the Tennessee Enamel Manufacturing Company, entitling the plaintiff to recover damages and under all the facts and circumstances of the case the Court finds that the plaintiff suffered damages in the sum of Seven Thousand Five Hundred ($7,500.00) Dollars which it is entitled to recover in this cause."

binding agreement upon which judgment for the plaintiff could properly be based was entered into between the parties. The testimony adduced by Stoves, Inc., was altogether too nebulous and hazy to support its contention that a definite contract for the sale of five carloads of stoves and furnaces was consummated. The dual and conflicting position occupied by W. B. Hunt, Sales Manager, and long-time employee of the appellant company and, at the time of the conversations in New Orleans out of which the alleged contract arose, also vice-president and heavy stockholder of the appellee corporation of which his son was secretary and treasurer as well as a heavy stockholder, renders his testimony subject to most skeptical scrutiny. Too much interlocking and conflicting self-interest on the part of those who allege that they consummated orally the 1948 Florida franchise arrangement taints their testimony, which was denied positively by Evans, president of the appellant corporation. Evans' testimony appears logical and reasonable and, therefore, acceptable to belief.

We shall set forth briefly our own view of the controlling facts disclosed by the record. Appellant, whose principal office is in Nashville, Tennessee, has for a long time manufactured gas heating stoves and furnaces and sold them through agents, distributors, jobbers and wholesale dealers. W. B. Hunt was for many years sales manager for appellant on a commission basis. He employed salesmen, among others S. B. DeFuentes, who, for a number of years sold Temco products for the Tennessee Enamel Manufacturing Company. J. J. Toledano, a brother-in-law of DeFuentes, had for several years sold Temco products as a distributor, all his dealings for the appellant company having been through W. B. Hunt.

In February of 1946, Stoves, Inc., was chartered under the laws of Louisiana. Its directors were Toledano, president and general manager and owner of some one hundred shares of its stock; DeFuentes, vice-president and owner of some two hundred shares; W. B. Hunt, vice-president and owner of some three hundred shares; his son, W. B. Hunt, Jr., secretary and treasurer and owner of some two hundred shares; and R. W. Gwin, vice-president and shareholder. A daughter of W. B. Hunt was also a shareholder. The business of this corporation was the distribution of heating equipment. Both W. B. Hunt and DeFuentes were stockholders in Robinson Heating Company and were interested in the sale and distribution of its products and in those of Herron Stove Company.

In the early part of 1947, appellant discharged its distributor for the State of Florida, because competing manufacturers were also represented by the agent. After unsuccessful efforts on the part of Hunt and DeFuentes to make connection with some established jobber in Florida to take on the Temco line, their corporation, Stoves, Inc., with the consent of President Evans of the Tennessee Enamel Manufacturing Company, in June of 1947 took on the handling of Temco products in Florida for the rest of that year. Satisfactory sales ensued. It should be borne in mind that Stoves, Inc., handled other products than appellant's in both Florida and Louisiana. There was conflicting testimony as to whether these other lines competed with Temco products, but from the weight of evidence it seems plausible that they did.

During the last week in December, W. B. Evans, president of the appellant corporation, went to New Orleans primarily to attend the Sugar Bowl game there on New Year's Day of 1948. While in the Crescent City, he called at the offices of the Louisiana distributors of Temco products. Although Stoves, Inc., had no distribution rights for his company in Louisiana, Evans visited its offices in New Orleans also. The instant controversy stems from this visit.

The Stoves, Inc., men were expressing themselves enthusiastically over the business which they had transacted for appellant in Florida during the last half of 1947. Evans admitted telling them that they had done a good job, but added that he told them also that it had not been difficult to sell stoves then, on account of their scarcity. He said he informed them that "the honeymoon was over," meaning that there was no longer a shortage of stoves; that work would be required to sell them;

and that his company had the capacity to take care of its customers' requirements. He testified further that when he conversed with Hunt and DeFuentes in New Orleans he complained of their selling Robinson and Herron heaters in competition with those manufactured by his company. He denied emphatically that he agreed or consented that Stoves, Inc., should be the exclusive distributor of his company's products in the State of Florida during 1948.

During the negotiations terminating in the alleged franchise for the Florida territory in 1948, Hunt and DeFuentes purported to represent appellant, and Toledano to represent Stoves, Inc. Hunt testified that inasmuch as he was representing appellant in the deal with Stoves, Inc., in which he was an officer, director and stockholder, he had first obtained authority from Evans, appellant's president to make the contract; and that this authority had been obtained upon the occasion of Evans' visit to the offices of Stoves, Inc., a day or so before the Sugar Bowl game. Evans denied positively any such authorization, saying that Hunt never even mentioned the matter to him.

Several witnesses asserted that Evans made statements in their presence to the effect that Stoves, Inc., would continue as distributor of Temco products in Florida. Attorney Thrasher was the only witness, however, who stated that Evans was present when Hunt agreed to the delivery of five carloads of stoves to Stoves, Inc., for the Florida territory in 1948. It should be noted that Toledano testified that Evans was not present when he contracted with DeFuentes and Hunt; and that all his dealings were strictly through Hunt and DeFuentes as representatives of the Tennessee Enamel Manufacturing Company.

Evans testified that the universal and long-established custom of his company when accepting orders from its salesmen was to have the purchase order approved by the credit department and acknowledged to the purchaser or distributor. He stated, further, that the first time he ever heard that Stoves, Inc., claimed to have orders or contracts with appellant for the delivery of five carloads of stoves in Florida during

1948 was when he received a letter from Toledano, dated April 12, 1948. This was after he had discharged Hunt, along with DeFuentes, from the employ of the appellant company in February of 1948, because of divided loyalty on the part of these men in handling other lines than Temco products.

M. A. Quinn, who had been a stockholder in Stoves, Inc., and had gone to Florida when he joined Hunt to represent appellant in certain southeastern states including Florida, was a witness for appellant. He testified that he was present when Evans met with Toledano, DeFuentes and Hunt in New Orleans during the latter part of December, 1947; that he never heard anything about Stoves, Inc., buying five carloads of heaters from appellant for delivery to Tampa, Florida; that the first time he heard of a claim by Stoves, Inc., that it had a contract with Tennessee Enamel Manufacturing Company for five carloads of heaters was about the first of March, 1948, at the James Robertson Hotel in Nashville. Although he traveled with Hunt in the middle west until around February 15, prior to the discharge of Hunt by Tennessee Enamel, Hunt at no time mentioned to him that Stoves, Inc., had a contract with the Tennessee company for five carloads of heaters; nor did Toledano or DeFuentes do so during a two weeks' period in January, 1948, when he was with them in Chicago.

R. N. Smith, Secretary-Treasurer of Tennessee Enamel Manufacturing Company, testified that he passed on the credit of Tennessee Enamel customers and put his O.K. on every order; that all orders were subject to acceptance by the home office; and that acknowledgments of all orders were mailed out to the customers. He stated that both Hunt and DeFuentes were familiar with the procedure. Asked if he would have approved the credit of Stoves, Inc., for five carloads of heaters, he answered categorically, "No." The first time he heard of the claim of Stoves, Inc., was in March of 1948, when President Evans called him into his office and had him read the letter from Toledano to which reference has previously been made.

Frank Drake, who succeeded Hunt as sales manager of the heating division of appellant, testified that he was in Chicago with Hunt, Toledano and DeFuentes early in 1948, and that none of them ever mentioned that Stoves, Inc., claimed to have the alleged order for five carloads of heaters. He said that Hunt had a display of both Temco and Robinson heaters on the Mart at Chicago; and that Robinson heaters and Herron heaters are competitive with Temco heaters.

The District Judge declared that he would have to find as a matter of fact that there was a franchise from Tennessee Enamel to Stoves, Inc., to sell Temco Products in Florida for the year 1948. The Judge stated: "I am aided in finding that by the fact that Stoves, Inc., went ahead and made their plans to sell the line of Temco products for the year 1948. While it is not controlling on my view of the question, Stoves, Inc., did go ahead and purchase a new station wagon, renovated their show rooms and offices and incurred expense in that matter, and employed a new salesman. But the main point upon which I base my finding is the fact that in January, Stoves, Inc., had an exhibit at the Gasparilla Day Fair and displayed Temco products. They spent $900.00 in making this exhibit, and the Tennessee Enamel Manufacturing Company, through Mr. Evans, contributed a hundred dollars toward the expense of this exhibit. Now, if Stoves, Inc., didn't have a franchise for the year 1948 to sell Temco products, why would the Tennessee Enamel Manufacturing Company contribute to the expense of this exhibit?" This rhetorical question had, we think, been satisfactorily answered by Evans, when on the witness stand. He said that the contribution had been made for national advertising purposes; that over 2,000,000 people went through the gates at the Gasparilla fair; and that he considered it worth a hundred dollars to his company for those people to see the Temco products. He commented upon the small size of the contribution, and that Stoves, Inc., had other lines on display.

■ We are unable to spell out a contract from the circumstances stressed by the District Court. The purchase of a station wagon, renovation of show rooms and office, and employment of a salesman at a small salary by the corporation are not convincing evidence that the Stoves company was relying upon an alleged oral sales agreement with Tennessee Enamel, inasmuch as Stoves, Inc., was selling products similar to Temco manufactured by other companies, in one of which Hunt and DeFuentes were stockholders. We conclude that the District Court was plainly in error in saying in its opinion that Stoves, Inc., had a franchise from appellant to sell its products in Florida for the year 1948, "without making any definite, iron clad contract upon which a suit for damages could be based alone," but that "Tennessee Enamel Manufacturing Company made a commitment to Stoves, Inc., to furnish five carloads of stoves for the year 1948." By use of the word "commitment," the Judge evidently meant an "implied contract"; but, from the foregoing review of the evidence, it would seem that proof of the alleged commitment is entirely too vague, hazy, and nebulous to form a solid foundation for contractual liability by implication.

Assuming the right of the District Judge under Civil Procedure Rule 15(b), 28 U.S. C.A., to pursue the course which he did [which, however, can be challenged upon high authority: Simms v. Andrews, 10 Cir., 118 F.2d 803, 807], with respect to decision of the case on ultimate issues not raised by the pleadings, we think the shift in position of the appellee [obviously to conform to the Judge's views], from the allegation in its declaration of a specific oral contract for the sale of five railroad cars of gas heating stoves and furnaces to the "commitment" theory upon which the court awarded judgment, renders the testimony adduced by appellee less susceptible to acceptance in support of the changed theory.

■ The District Judge, in deciding in favor of the plaintiff upon a ground not pleaded, did violence to the law of Tennessee, which has always rigidly required that *probata* must correspond to *allegata*. See Johnson v. Luckado, 59 Tenn. 270; Duluth National Bank v. Knoxville Fire Insurance Company, 85 Tenn. 76, 87, 1 S.W.

689 (opinion by Judge Lurton, later a member of this court and of the Supreme Court of the United States); Bradshaw v. Van Valkenburg, 97 Tenn. 316, 322, 37 S.W. 88; American Lead Pencil Company v. Nashville, Chattanooga & St. Louis Railway, 124 Tenn. 57, 65, 134 S.W. 613, 32 L.R.A., N.S., 323.

▮ In our view, the District Court was not justified from the evidence in concluding that under the practice and custom there was a commitment on the part of appellant to maintain Stoves, Inc., as its Florida agent for a full year. The same comment and the same Tennessee authorities cited by this court in Bagwell v. Susman, 6 Cir., 165 F.2d 412, 416, seem applicable here. The Tennessee cases previously cited were Cheek v. American Eagle Fire Ins. Co., 6 Tenn.App. 632, 636; Grissom v. Commercial National Bank, 87 Tenn. 350, 351, 10 S.W. 774, 3 L.R.A. 273; Charles v. Carter, 96 Tenn. 607, 36 S.W. 396. The point of the Tennessee authorities is that usages or customs of trade, to be effectively binding in law, must be imperative and compulsory in character and so well known as to affect the person to be bound with knowledge of them and raise the presumption that he dealt with reference to them. The direct testimony of both President Evans and Secretary-Treasurer Smith of the appellant company was that all purchase orders had to be approved by its home office and acknowledged to the purchaser or distributor. This testimony has not been successfully impeached.

▮ Tennessee authorities lay down the doctrine that the interpretation given to a contract by the parties themselves, as shown by their acts, will be adopted. Fidelity-Phenix Fire Ins. Co. of New York v. Jackson, 181 Tenn. 453, 466, 181 S.W.2d 625; American Barge Line Co. v. Jones & Laughlin Steel Corporation, 179 Tenn. 156, 174, 163 S.W.2d 502; Canton Cotton Mills v. Bowman Overall Co., 149 Tenn. 18, 29, 257 S.W. 398. It is also well established that, to be enforceable, a contract must not be lacking in mutuality. In Curtiss Candy Co. v. Silberman, 6 Cir., 45 F.2d 451, this court held that an alleged contract between a manufacturer of candy and certain jobbers for the distribution of the products of the manufacturer was unenforceable for lack of mutuality. In that case, the salesman of the manufacturer had promised jobbers exclusive distribution privileges and accepted orders accordingly; and the jobbers subsequently had obtained confirmation of the arrangement from the manufacturer. The parties, however, had not reached a definite agreement concerning prices, terms, etc., nor had they come to any definite agreement binding the manufacturer to furnish in the future or the jobbers to buy any specific quantity of candy, or to maintain contractual relationship for any definite period of time. See also Dennis v. Slyfield, 6 Cir., 117 F. 474; Big Cola Corporation v. World Bottling Co., 6 Cir., 134 F.2d 718. Compare Canton Cotton Mills v. Bowman Overall Co., supra. On the entire record, it is obvious that there was a lack of mutuality in an understanding that appellant was bound to furnish the appellee with stoves, or furnaces, for distribution in Florida during the year 1948. There was, therefore, no meeting of minds in a binding contract, either express or implied.

Attorneys for the appellant have submitted a strong brief and argument to the effect that the alleged oral agreement made in Louisiana was unenforceable in the federal court in Tennessee where the oral agreement, as is the case here, was to be performed in Tennessee and in Florida. By virtue of the statutes of frauds of both Tennessee and Florida, the alleged oral agreement would be unenforceable. See Code of Tennessee, section 7197. The Florida statute is to the same effect.

The appellee has made a vigorous rejoinder with supporting authorities to the effect that the *lex loci contractus*—that is, the law of Louisiana—controls, and not the *lex fori*—Tennessee—or the law of the State of performance—Florida. We have considered this branch of the case upon which the District Judge also sustained appellee, and have studied the authorities submitted by the respective parties.

▮ Among the important cases cited by the appellant, are: Franklin Savings & Loan Corporation v. Snapp, Deputy Sheriff,

179 Tenn. 151, 154, 163 S.W.2d 332; First National Bank of Geneva, Ohio, v. Shaw, 109 Tenn. 237, 70 S.W. 807, 59 L.R.A. 498; Peebles v. Green, 74 Tenn. 471, 474; Ashley & Gibbs v. Preston, 162 Tenn. 540, 39 S.W. 2d 279; Stevenson v. Lima Locomotive Works, 180 Tenn. 137, 146, 172 S.W.2d 812, 148 A.L.R. 370; Deaton v. Vise, 186 Tenn. 364, 210 S.W.2d 665; Ohlendiek v. Schuler, 6 Cir., 30 F.2d 5; Reed v. Kelly, 7 Cir., 177 F.2d 473, 475; Hamilton v. Glassell, 5 Cir., 57 F.2d 1032; Restatement of the Law (Conflict of Laws), section 602. The appellee cites, *inter alia,* the following cases: Anderson v. May, 57 Tenn. 84, 88; Dougherty v. Curle, 21 Tenn. 453; Eaves v. Gillespie, 31 Tenn. 128; Elliott National Bank v. Western and Atlantic Railroad, 70 Tenn. 676; Bowman v. Price, 143 Tenn. 366, 226 S.W. 210; Huffine v. McCampbell, 149 Tenn. 47, 257 S.W. 80; Manufacturers Finance Co. v. B. L. Johnson & Co., 15 Tenn.App. 236. But, inasmuch as we have found on the facts that there was no enforceable contract existing between the parties and are reversing the District Court upon that ground, we deem it inadvisable to state our view as to which state's statute of frauds is applicable.

■■ The rule established by the Supreme Court in Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, is that, in diversity of citizenship cases, the federal courts, when deciding questions of conflict of laws, must follow the rules prevailing in the states in which they sit. Independent decision upon our own reasoning and upon the authority of federal decisions on a question of conflict of laws having been thus curtailed, we are reduced to the position of mere annotators of state law. An annotator is, of course, not empowered to speak with the authority of an unrestrained court in construing, distinguishing, or applying opinions apparently in conflict. Interpretation of state law by a United States Court of Appeals may be repudiated by the courts of the state whose laws are being construed. Our opinions in this field of state law, therefore, have no binding authoritative effect. Of course, we are compelled by the doctrine of Erie Railroad

Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, in diversity of citizenship cases, to be annotators of state law where such annotation is necessary to decision. But where it is unnecessary to decision, we are unwilling to assume the unenviable role for an appellate court of the United States of having our pronouncements put in jeopardy of being declared incorrect by a state court inferior to the highest court of the state. Thus far we strive to uphold the innate dignity of a federal appellate court.

The judgment of the District Court is reversed and the case is ordered to be dismissed at the cost of the appellee.