NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0078n.06

No. 13-3269

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 29, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ENTITLE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant | ) | |
| -- Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| v. | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| DARWIN SELECT INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff | ) | |
| -- Appellee. | ) | |

Before: SUTTON and KETHLEDGE, Circuit Judges; and DOW, District Judge.[*]

DOW, District Judge. In this dispute involving coverage under a professional liability insurance policy, the policyholder (EnTitle) appeals the district court's grant of summary judgment in favor of its insurance company (Darwin). EnTitle, a title insurance company, sought coverage under its professional liability policy for monies that it was contractually obligated to pay to its own policyholders after EnTitle's title agent (Direct Title) misappropriated the policyholders' escrow funds. Because EnTitle's professional liability policy only covered wrongful acts of entities "for whom [EnTitle] is legally responsible," and Direct Title was not such an entity, we affirm the district court's ruling in Darwin's favor.

---

[*] The Honorable Robert M. Dow, Jr., United States District Judge for the Northern District of Illinois, sitting by designation.

I.

EnTitle Insurance Company is a title insurance underwriter that used Direct Title Insurance Agency as one of its title insurance agents. Essentially, Direct Title offered title insurance to clients on EnTitle's behalf. The parties' agency agreement expressly limited Direct Title's authority to issuing title insurance policies: "EnTitle hereby appoints [Direct Title] to be its non-exclusive policy issuing agent . . . . [Direct Title] shall only issue EnTitle's title policies on real property located within the Appointed States." To the extent that Direct Title performed closing and escrow-related services for the clients, Direct Title did so on its own behalf. Specifically, Direct Title agreed to "keep safely and segregated in separate bank accounts all monies entrusted to it in the course of its escrow or closing business." The agency agreement further stated that "[e]xcept for purposes of issuing and delivering title evidence, subject to and in accordance with the terms and provisions of this Agreement, [Direct Title] is an independent contractor, and shall be in full and complete control of the operation of his/her/its title office, including full control of all personnel."

As a means of attracting and securing business, EnTitle would often (though not always) offer a closing protection letter ("CPL") to a client, which obligated EnTitle to reimburse the client in the event that Direct Title engaged in fraud, dishonesty, or negligence with respect to the handling of the client's closing or escrow funds. EnTitle typically issued these letters at the request of a party involved in the closing transaction – most often the lender, but occasionally the seller or borrower – and some states, such as Ohio, require title insurance companies like EnTitle to offer CPLs. The offeree remained free to accept or reject the offer of a CPL, the cost of which varied by state but typically ran between $30-$50. Although the record indicates that fourteen of EnTitle's CPL offers were accepted, the record does not reveal (and neither EnTitle nor Darwin

knew precisely at oral argument) how many of EnTitle's CPL offers were declined. As EnTitle's professional liability insurer, Darwin had no involvement in EnTitle's issuance of CPLs, no input as to the terms or language included in those CPLs, and did not require that EnTitle offer or issue CPLs to its prospective clients.

When Direct Title misappropriated $3.9 million in client escrow funds, EnTitle reimbursed the fourteen affected clients to whom it had issued a CPL, pursuant to its contractual obligations. Where there was no CPL, however, EnTitle disclaimed all financial responsibility on the ground that Direct Title was not EnTitle's agent with respect to escrow and closing funds.[1]

After satisfying its reimbursement obligations under the CPLs, EnTitle sought coverage from Darwin under its professional liability insurance policy. EnTitle's insurance policy provided that:

> The Insurer will indemnify the Insured for Loss, including Defense Expenses, from any Claim or Extra-Contractual Claim first made against them during the Policy Period or any applicable Extended Reporting Period . . . for **Professional Liability Wrongful Acts** committed on or after the date of incorporation or formation of the Named Insured and prior to the end of the Policy Period.

(Emphasis added.) The policy defined "Professional Liability Wrongful Act" to mean: "any actual or alleged act, error, omission, misstatement or misleading statement, in the performance of or failure to perform Professional Services . . . **by any Insured, or by an individual or entity for whom the Company is legally responsible**." (Emphasis added.) When Darwin refused coverage, EnTitle sued for breach of contract.

On cross motions for summary judgment, the district court ruled in Darwin's favor on two separate grounds. *EnTitle Ins. Co. v. Darwin Select Ins. Co.*, 2013 WL 422712 (N.D. Ohio

---

[1] EnTitle obtained a consent judgment in the amount of $3.9 million against Direct Title and its principal in a Colorado federal court, but the judgment is considered uncollectible because Direct Title has ceased operations and its principal has sought bankruptcy protection.

Feb. 1, 2013). First, the district court concluded that EnTitle lacked coverage under the "Professional Liability Wrongful Act" provision of the policy because (a) EnTitle did not itself engage in any misconduct and (b) EnTitle was not legally responsible for Direct Title (and its misconduct). As the court explained, the CPLs rendered EnTitle *contractually*, but not *legally*, responsible for Direct Title's mismanagement of the escrow funds. *Id*. at \*5-6. Second, the district court ruled that even if Direct Title had engaged in a covered Professional Liability Wrongful Act, the policy's "loss" exception would exclude coverage. *Id*. at \*6-7.

## II.

In this case, the parties properly invoke our diversity jurisdiction. Ohio is both EnTitle's state of incorporation and its principal place of business. Darwin is an Arkansas corporation with its principal place of business in Connecticut. The amount in controversy at the time that the suit was filed was the $3,000,000 liability limit under EnTitle's insurance policy. The parties agree that Ohio law governs the Court's interpretation of EnTitle's insurance policy and that we review *de novo* the district court's grant of summary judgment in favor of Darwin. *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 635 (6th Cir. 2010).

As an initial matter, we accept for purposes of this opinion the district court's determination that "EnTitle's issuance of CPLs is a 'Professional Service' under the terms of the Policy." *EnTitle*, 2013 WL 422712, at \*5. We turn next to Darwin's arguments that EnTitle's payouts under the CPLs do not fall within the policy's insurance coverage. In support of those arguments, Darwin contends that the payments did not result from a "wrongful act," as defined by the policy and that Direct Title is not an "entity" for whom EnTitle was legally responsible. Rather, Darwin argues, EnTitle voluntarily accepted the debt resulting from the contractual liability that was formed through the CPLs. By Darwin's lights, the fact that EnTitle only

4

reimbursed clients to whom it had given a CPL confirms that the issuance of the CPLs, not Direct Title's theft, formed the obligation to make the payouts for which EnTitle sought coverage. In fact, outside of the fourteen reimbursements that it made under the CPLs, EnTitle denied all responsibility and liability related to Direct Title's unlawful misappropriation of its clients' escrow and closing funds.

EnTitle argues that Direct Title's wrongful acts – not the issuance of the CPLs – resulted in its liability and, relying on *Merz v. Motorists Mutual Insurance Co.*, No. CA2006-08-203, 2007 WL 1394560 (Ohio Ct. App. May 14, 2007), submits that its contractual obligations under the CPLs rendered it "legally responsible" for the wrongful acts of Direct Title. *Merz* is one of three Ohio Court of Appeals decisions addressing similar policy language in the context of demands for underinsured motorist ("UIM") coverage. In two of the cases, the Court of Appeals held that a setoff provision reducing the insurance company's liability "by all sums paid for 'bodily injury' by or on behalf of anyone who is legally liable" "clearly refers to persons legally liable *for the accident*" – by which it meant tortfeasors alone. *Savage v. Encompass Ins. Co.*, No. 04CA39, 2005 WL 136620, at *4 (Ohio Ct. App. Jan. 14, 2005) (emphasis added); *Wright v. Cincinnati Ins. Co.*, No. 19802, 2003 WL 21830278, at *5 (Ohio Ct. App. Aug. 8, 2003). In *Merz*, by contrast, the Court of Appeals held that the "legally responsible" parties included "persons or organizations who are contractually liable to the injured party, as well as those who are liable to the injured party as a matter of tort." 2007 WL 1394560, at *7. EnTitle argues that *Merz* stands for the proposition that the phrase "legally responsible" includes both contractual liability and tort liability, such that EnTitle was legally responsible for Direct Title's wrongful acts by virtue of the contractual obligations contained in the CPLs.

Even if we were persuaded that *Merz* sets out the authoritative construction of the phrase "legally responsible" (or "legally liable") in the context of the UIM policies at issue in the cases cited above – an issue we need not and therefore do not decide – that policy language arises in a different context here and that context necessarily informs its meaning. *See Caraco Pharmaceutical Laboratories, Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1681 (2012) ("The meaning of [a] phrase turns on its context."); *Johnson v. United States*, 559 U.S. 133, 139 (2010) ("[C]ontext determines meaning."). In the *Merz* line of cases, the courts determined UIM coverage on a case-by-case basis depending on which other persons or entities may have been legally "liable" or "responsible" for injuries sustained in a particular automobile accident. Here, by contrast, EnTitle's policy only covers acts or omissions by an "*entity* for whom [EnTitle] is legally responsible." We therefore must examine whether EnTitle was legally responsible for Direct Title as an *entity*.

In making that determination, we begin by looking to the language that EnTitle itself selected in defining its relationship with Direct Title and the positions that it took in regard to its obligations in the wake of Direct Title's wrongdoing. In the CPLs, EnTitle set out specific limitations on its relationship with Direct Title: "The Issuing Agent is the Company's agent only for the limited purpose of issuing title insurance policies. Neither the Issuing Agent nor the Approved Attorney is the Company's agent for the purpose of providing other closing or settlement services."[2] Consistent with that express limitation, EnTitle's Rule 30(b)(6) witness did not take issue with the statement that "a closing protection letter doesn't make EnTitle responsible for Direct Title's escrow activities, but it is an agreement to indemnify for loss in certain circumstances." As to the fourteen customers to whom EnTitle issued a CPL, EnTitle issued reimbursements for the full amount that Direct Title misappropriated. As to all other

---

[2] Two of the CPLs do not contain this language for reasons that are not apparent from the record.

customers, EnTitle paid nothing. According to EnTitle, absent the contractual tie of a CPL, it was not responsible for Direct Title's fraud, dishonesty, or negligence with respect to the handling of escrow funds, because Direct Title was EnTitle's agent solely for the purpose of issuing title insurance. All of the foregoing supports the district court's conclusion that the wrongful acts of Direct Title at issue in this litigation were not committed by EnTitle or by an "entity for whom [EnTitle] is legally responsible," and thus do not fall within the scope of the "Professional Liability Wrongful Acts" for which the Darwin policy provides coverage.

EnTitle effectively asks us to interpret its professional liability insurance policy to cover wrongful acts by entities for whom EnTitle is *not* legally responsible, if the act of that entity triggers contractual liability for which EnTitle *is* responsible. But that simply is not what the policy says. "When the terms of an insurance policy are clear and unambiguous, Ohio law requires a court to apply them to the facts without engaging in any construction." *Toledo-Lucas Cnty. Port Auth. v. Axa Marine & Aviation Ins. (UK) Ltd.*, 368 F.3d 524, 530 (6th Cir. 2004). We must "presume that the intent of the parties is reflected in the language used in the policy," *Safeco Ins. Co. v. White*, 913 N.E.2d 426, 430 (Ohio 2009), and "adopt the construction of the insurance contract which most nearly corresponds with the intention of the parties as ascertained from the words employed by them in their plain, ordinary and usual meaning." *Reliable Springs Co. v. St. Paul Fire & Marine Ins. Co.*, 869 F.2d 993, 994 (6th Cir. 1989) (quotation omitted). Here, the language of the policy only covers "acts . . . by an individual or entity for whom the Company is legally responsible." EnTitle and Direct Title's agency agreement, as well as EnTitle's own conduct, make clear that EnTitle did not bear legal responsibility for Direct Title's closing and escrow-related activities. If it did, EnTitle should have readily reimbursed all of its customers who were victims of Direct Title's misappropriation, not just those who had CPLs.

To be sure, if the record showed that (1) CPLs were required by law or by Darwin, (2) Darwin had a say in the content of the CPLs, (3) Darwin received a portion of the premium for the CPLs, and/or (4) Darwin had expressly agreed to extend coverage for the obligations that its policyholders like EnTitle undertook when they entered into CPLs, then the context might dictate a contrary result. But none of those circumstances is present on the current record.

In the end, EnTitle asks that we interpret its insurance policy to allow EnTitle to secure business by making contractual guarantees to its clients regarding the performance of third-party business partners that are not its agents and then force its insurer to foot the bill when that third-party fails to perform according to EnTitle's guarantee, despite EnTitle's disavowal of all non-contractual responsibility, legal or otherwise. Because this interpretation directly contravenes the language of its professional liability insurance policy, we must decline EnTitle's request.[3]

III.

For the reasons stated above, the district court's grant of summary judgment in favor of Darwin is affirmed.

---

[3] In view of our ruling affirming the district court's determination that the Darwin policy at issue does not provide coverage, we will refrain in the interests of judicial economy and comity from any consideration of whether the "loss" exception also applies. *See*, *e.g.*, *Tenn. Enamel Mfg. Co. v. Stoves, Inc.*, 192 F.2d 863, 869 (6th Cir. 1951) (explaining why, under the *Erie* doctrine, federal courts sitting in diversity should refrain from issuing pronouncements on state law that are not necessary to the decision of a case).